UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

ABDIRAHMAN HAJI-HASSAN,           )
                                  )
            Petitioner            )
                                  )
      v.                          )        2:23-cv-00355-LEW
                                  )
STATE OF MAINE,                   )
                                  )
            Respondent            )

**RECOMMENDED DECISION ON 28 U.S.C. § 2254 PETITION**

Petitioner, pursuant to 28 U.S.C. § 2254, seeks relief from a state court conviction and sentence on a murder charge. (Petition, ECF No. 1.) Petitioner claims (1) his trial attorney provided ineffective assistance during jury selection by failing to object to a peremptory challenge, (2) his trial attorney provided ineffective assistance at trial by failing to seek to introduce in evidence the prior bad acts of an alternate suspect, and (3) the state court violated his right to confront a witness against him by precluding cross-examination regarding the reasons the witness's prior employment was terminated. The State asks the Court to dismiss the petition. (Response, ECF No. 4.)

After a review of the section 2254 petition, the State's request for dismissal, and the record, I recommend the Court grant the State's request and dismiss the petition.

FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]

## A.    The Shooting, Arrest, and Charges

At just after 9:00 p.m. on November 21, 2014, authorities received a 9-1-1 call from an individual named Michael DeBlois, who requested assistance at his apartment because a man had been shot in the head and killed.  A few days later, the State filed a criminal complaint charging Petitioner with murder.  *State v. Haji-Hassan*, Me. Super. Ct., CUMCD-CR-2014-07716, Docket Record at 1–2, Petitioner's Appendix ("App.") at 237–38, ECF No. 1-1; Complaint, App. at 4.)  Law enforcement officers located and arrested Petitioner in Minnesota.  (Docket Record at 1, App. at 237; Trial Tr. 592–98.)  A grand jury indicted Petitioner in January 2015.   (Docket Record at 1–2, App. at 237–38; Indictment, App. at 5; Order Amending Indictment, App. at 6.)  A jury trial was held in December 2016.  (Docket Record at 7–8, App. at 243–44.)

## B.    Trial and Sentencing

DeBlois testified that, in addition to himself and the victim, three other people were in his apartment leading up to the shooting: Petitioner, Gang Majok, and Mohammed Ashkir. [2] (Trial Tr. at 174–75.)  DeBlois knew Petitioner for at least two years, and the victim for approximately one year, while he had only met Majok and Ashkir on a couple

---

[1] The facts recounted below are drawn primarily from state court summaries and trial transcripts.  *See* 28 U.S.C. § 2254(e)(1) ("a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence"); *Hensley v. Roden*, 755 F.3d 724, 727 (1st Cir. 2014) (recounting the facts as "derived from the [state court] decision").

[2] At trial, the relevant individuals were often referred to by nicknames.  Here, for simplicity, I refer only to their last names.

of occasions.  (*Id.* 195–202.)  Petitioner arrived in the afternoon or early evening, well before the shooting, and DeBlois left the apartment twice to purchase items from nearby convenience stores, which items included Coca Cola, cigarettes, and other goods for them to share.  (*Id.* at 195–97.)  Later that evening, the victim, Majok, and Ashkir arrived together.  (*Id.* at 202–03).

When the three recently arrived guests began handling, using, or packing drugs at the dining table, DeBlois went into his room at their direction.  (*Id.* at 204–05.)  According to DeBlois, when he came out of the bedroom, he saw Petitioner pointing a gun at Ashkir. (*Id.* at 179.)  Deblois recognized the gun as a .357 magnum revolver because he was familiar with that type of firearm.  (*Id.* at 218.).  Petitioner lowered the gun to his side and the victim moved between Petitioner and Ashkir.  (*Id.* at 182–85.)  DeBlois testified that Petitioner fired a shot into the floor and shortly afterward fired a shot into the victim's leg. (*Id.* at 185.)  DeBlois asserted that Ashkir fled out the door, Majok stood up and moved in a direction DeBlois did not observe, and DeBlois backed into the kitchen and grabbed a knife before hearing some threats, a third gunshot, a thud, and finally a rustling sound as one or perhaps two people went out the door of the apartment.  (*Id.* at 186–91.)  DeBlois found the victim near the door, checked for a pulse, and called 9-1-1.  (*Id.* at 192–94.) DeBlois did not see anyone other than Petitioner with a gun that night.  (*Id.* at 190–91.)

Law enforcement officers presented evidence they had collected which corroborated aspects of DeBlois' trial testimony.  For example, officers found a receipt from a nearby convenience store for a purchase made on the day of the shooting, (*id.* at 700–02), an employee identified Petitioner as being present at the time of the purchase, (*id.* at 703),

Deblois was seen on the video from another convenience store on the evening of the shooting, (*id.* at 339–48), Coca Cola containers and other items from the apartment contained fingerprints and DNA evidence that, according to the State's witnesses, matched to the victim, Petitioner, Majok, and Ashkir, (*id.* at 445–460, 777–91), and a holster found in the apartment contained only Petitioner's DNA, (*id.* at 789).

The Chief Medical Examiner, Dr. Mark Flomenbaum, testified that he performed an autopsy and found a lead bullet in the victim's skull and an entrance and exit wound in the victim's left thigh. (*Id.* at 630–41.) Investigators found another bullet near the victim's body, and a firearms expert testified that the marks on the two bullets showed they were fired from the same weapon, which could have been a .357 revolver. (*Id.* at 820–21.)

Police did not find another bullet or bullet hole reflecting that a shot was fired into the floor of the apartment. (*Id.* at 421–23.) They did find a small piece of blue and white material containing only Petitioner's DNA. (*Id.* at 790–91.) When he was arrested and returned to Maine, Petitioner had a wound on his right leg; investigators obtained photographs and x-rays. (*Id.* at 460–62.) Dr. Flomenbaum testified that the photographs and x-rays showed two linear excoriations and two lead bullet fragments in Petitioner's leg that were consistent with a gunshot wound inflicted six to ten weeks prior, which time frame included the day the victim was killed. (*Id.* at 644–50, 677.)

At trial, the defense challenged the reliability of Deblois as a witness. For example, counsel demonstrated that DeBlois admitted that he used crack cocaine before and shortly after the shooting, (*id.* at 203–206, 968), had been diagnosed with schizophrenia, had experienced hallucinations and amnesia in the past, and was prescribed multiple

medications for his condition but did not take the medications consistently and did not take them on the day of the shooting.  (*Id.* at 171, 235–42, 955.)  The defense also noted and argued that there were inaccuracies and inconsistencies in Deblois' testimony.

The defense also pointed to Majok as an alternate suspect.  (*Id.* at 285–87, 969–70.) Defense counsel emphasized that the State had not produced a murder weapon, there was no evidence corroborating Deblois' report that there was a shot into the floor, and that Petitioner's blood was not found in or around the apartment or the possible getaway vehicle.  (*Id.* at 363–64, 528, 965–67.)  Counsel suggested that Dr. Flomenbaum's conclusions regarding the timing of Petitioner's leg injury could have been influenced by another investigator suggesting to him her suspicion that the injury occurred during a shooting approximately eight weeks before the images were taken.  (*Id.* at 646–47, 673–79, 965.)  A nurse who assessed Petitioner testified that he told her that he received the injury jumping a fence.  (*Id.* at 869.)

The jury found Petitioner guilty.  (*Id.* at 1003–1009; Docket Record at 8, App. at 244.)  In March 2017, the Court sentenced Petitioner to thirty-nine years in prison. (Judgment, App. at 37; Docket Record at 9, App. at 245.)

## C.   Appeal and State Postconviction Petitions

In March 2017, Petitioner filed an application for leave to appeal from his sentence, and in May 2017, the Sentence Review Panel granted leave to appeal.  (*Haji-Hassan v. State*, Sentence Review Panel, SRP-17-138, Docket Record at 2.)  Petitioner also filed a direct appeal of the judgment.  As relevant here, on appeal, Petitioner argued the Superior Court erred when it precluded cross-examination of Dr. Flomenbaum regarding the

termination of his employment as Chief Medical Examiner for Massachusetts.  (Brief of Appellant, App. at 42–88.)  In March 2018, the Maine Law Court affirmed.  *State v. Haji-Hassan*, 2018 ME 42, 182 A.3d 145.

Petitioner filed a state postconviction motion in June 2018.  (*Haji-Hassan v. State*, Me. Super. Ct., CUMCD-CR-2018-02928, Docket Record at 1, App. at 250; Postconviction Petition, App. at 126–35; First Amended Petition, App. at 136–40; Second Amended Petition, App. at 145–47; Third Amended Petition, App. at 156–57.)  Petitioner argued that his attorney provided ineffective assistance by failing to challenge the removal of a Black woman and a recent immigrant from the jury pool and by failing to introduce evidence of Majok's prior violent conduct.  (Second Amended Petition at 2, App. at 146; Third Amended Petition at 1, App. at 156.)  After a hearing in July 2021, the Superior Court denied Petitioner's request for postconviction relief. (Postconviction Decision, App. at 200–15; Docket Record at 4–5, App. at 253–54.)

Petitioner sought discretionary review of the denial from the Maine Law Court, but in May 2022, the Law Court denied a certificate of probable cause to appeal the denial of the state postconviction petition.  (*Haji-Hassan v. State*, Me. L. Ct., CUM-21-396, Docket Record at 2–3, App. at 256–57; Order Denying Certificate of Probable Cause, App. at 236.)  Petitioner subsequently filed the federal § 2254 petition.

## DISCUSSION

### A.    Legal Standards

Pursuant to 28 U.S.C. § 2254(a), a person in custody pursuant to the judgment of a state court may apply to a federal district court for writ of habeas corpus "only on the

ground that he [or she] is in custody in violation of the Constitution or laws or treaties of the United States."

Absent circumstances not relevant to Petitioner's case, a petitioner is required to exhaust available state court remedies before he seeks federal habeas review. 28 U.S.C. § 2254(b), (c).[3] "Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Baldwin v. Reese,* 541 U.S. 27, 29 (2004) (quoting *Duncan v. Henry,* 513 U.S. 364, 365 (1995) (per curiam)) (quotation marks omitted). In *Baldwin,* the Court noted that "[t]o provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of

---

[3] Title 28 U.S.C. § 2254(b) and (c) address exhaustion and state:

**(b) (1)** An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that—

**(A)** the applicant has exhausted the remedies available in the courts of the State; or

**(B) (i)** there is an absence of available State corrective process; or

**(ii)** circumstances exist that render such process ineffective to protect the rights of the applicant.

**(2)** An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.

**(3)** A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement.

**(c)** An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

discretionary review), thereby alerting that court to the federal nature of the claim." *Id.* (quoting *Duncan,* 513 U.S. at 365–66).

To exhaust a claim fully in state court in Maine, a petitioner must request discretionary review by the Law Court. *See* 15 M.R.S. § 2131. The Supreme Court has held that a procedural default bars federal review absent a demonstration of cause for the default and prejudice to the petitioner:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991).[4]

In *Martinez v. Ryan*, 566 U.S. 1 (2012), the Supreme Court recognized a "narrow exception" to its holding in *Coleman*, based on equity, not constitutional law: "Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." 566 U.S. at 9, 16. However, when the procedural default relates to post-conviction counsel's actions at the discretionary-review stage rather than at the initial-review stage of the collateral proceedings, habeas relief is not available:

> The holding in this case does not concern attorney errors in other kinds of proceedings, including appeals from initial-review collateral proceedings,

---

[4] Procedural default is a judicial doctrine "related to the statutory requirement that a habeas petitioner must exhaust any available state-court remedies before bringing a federal petition." *Lovins v. Parker,* 712 F.3d 283, 294 (6th Cir. 2013) (citing 28 U.S.C. § 2254(b), (c)).

> second or successive collateral proceedings, and petitions for discretionary review in a State's appellate courts.  It does not extend to attorney errors in any proceeding beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance at trial . . . .

*Martinez*, 566 U.S. at 16 (citations omitted).

As to federal habeas claims that were adjudicated on the merits in state court, the federal court may not grant relief unless (1) the state court decision was contrary to, or an unreasonable application of, federal law, as determined by the Supreme Court, pursuant to 28 U.S.C. § 2254(d)(1); or (2) the decision was based on an unreasonable determination of the facts, pursuant to section 2254(d)(2).[5]

As to review of a state court decision under section 2254(d)(1), "[i]t is settled that a federal habeas court may overturn a state court's application of federal law only if it is so erroneous that 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents.'"  *Nevada v. Jackson,* 569 U.S. 505, 508-09 (2013) (per curiam) (quoting *Harrington v. Richter,* 562 U.S. 86, 102 (2011)).  "A state court must be granted a deference and latitude that are not in operation when the case involves review under the [*Strickland v. Washington*, 466 U.S. 668 (1984)] standard

---

[5] Title 28 U.S.C. § 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim−
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

itself." *Harrington*, 562 U.S. at 101. Claims of ineffective assistance of counsel are thus subject to a "'doubly deferential'" standard of review, in deference to both the state court and defense counsel. *Woods v. Etherton,* 578 U.S. 113, 117 (2016) (per curiam) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011)). State court determinations of fact "shall be presumed to be correct," and "[t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).[6]

In *Strickland*, the Supreme Court set forth the relevant Sixth Amendment standard by which claims of ineffective assistance based on counsel's errors are evaluated on the merits; *Strickland* requires a petitioner to demonstrate that "counsel's representation fell below an objective standard of reasonableness," and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 688, 694. A court need not "address both

---

[6] Because the Law Court's decisions are the final state court adjudications on the merits of each claim, the decisions under review in this case are the Law Court's orders affirming the decisions of the trial court. *See Greene v. Fisher*, 565 U.S. 34, 40 (2011) (noting that the last state-court adjudication on the merits of the petitioner's constitutional claim occurred on direct appeal to the state's supreme court); *Clements v. Clark*, 592 F.3d 45, 52 (1st Cir. 2010) ("A matter is 'adjudicated on the merits' if there is a 'decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground.'") (quoting *Teti v. Bender*, 507 F.3d 50, 56-57 (1st Cir. 2007)).

However, because the Law Court's postconviction order did not explain the Court's reasoning for denying a certificate of probable cause, the federal court may consider the trial court's decision for those claims:

> We hold that the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning.

*Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018) (noting the state may rebut the presumption).

components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697. A court presumes "that counsel has 'rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Companonio v. O'Brien*, 672 F.3d 101, 110 (1st Cir. 2012) (quoting *Strickland*, 466 U.S. at 690).

A court considers "the totality of the evidence," and "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 695-96. "[T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." *Id.* at 696.

### B.   Ineffective Assistance Claims

#### 1.   Failure to Raise a *Batson* Challenge

Petitioner argues his attorney provided ineffective assistance by failing to challenge the prosecutor's decision to remove a potential juror who was a Russian immigrant. In *Batson v. Kentucky*, 476 U.S. 79, 89 (1986), the Supreme Court held that the Equal Protection Clause forbids a prosecutor from exercising peremptory challenges to remove potential jurors on account of their race. Courts ordinarily use a three-step process to determine whether a preemptory challenge is the product of purposeful discrimination:

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

*Foster v. Chatman*, 578 U.S. 488, 499 (2016) (quoting *Snyder v. Louisiana*, 552 U.S. 472, 476-77 (2008)).

Petitioner did not fully exhaust the issue by including it in his petition for discretionary review from the Law Court.  *See Baldwin,* 541 U.S. at 29.  The petition for discretionary review noted that the lone Black woman in the jury pool was not selected for the jury,[7] but the discretionary review petition did not mention a potential juror who was born in Russia.  Petitioner acknowledges that the claim is procedurally defaulted under the circumstances.[8]

Petitioner argues that under *Martinez,* 566 U.S. at 9, there is cause and prejudice to excuse the procedural default because postconviction counsel provided ineffective assistance by failing to raise the national-origin-*Batson* claim in the state petition for discretionary review.  In general, because there is no federal constitutional right to counsel during postconviction proceedings, ineffective assistance of counsel in a state

---

[7] The state postconviction court denied relief based on the *Batson* claim as to the Black woman in the jury pool because she was never subject to a peremptory challenge as she was not among those randomly selected as prospective jurors in the case.  (Postconviction Decision at 13, App. at 212.)  Petitioner does not challenge that conclusion here.

[8] Ordinarily, federal district courts cannot entertain "mixed petitions" containing one or more exhausted claims and one or more unexhausted claims.  *Rose v. Lundy*, 455 U.S. 509, 510 (1982). Federal district courts typically warn state petitioners that they must choose whether to (1) dismiss the unexhausted claims and proceed with the exhausted claims or (2) dismiss the whole petition and return to state court to exhaust all claims before refiling the federal petition.  *See DeLong v. Dickhaut*, 715 F.3d 382, 387 (1st Cir. 2013). District courts also have discretion to use a "stay-and-abeyance" procedure to pause the federal proceedings while a petitioner pursues the available state remedies for a potentially meritorious unexhausted claim.  *See Rhines v. Weber*, 544 U.S. 269, 278 (2005).

When there is no longer a remedy available under state law, such as when the claim is precluded by a state procedural rule barring issues that could have been raised earlier, the claim is deemed exhausted but procedurally defaulted.  *See O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999).  Maine law contains such a rule.  *See State v. Chesnel*, 2011 ME 84, ¶ 11, 25 A.3d 946, 949 ("A person seeking post-conviction review is required by statute to raise all possible grounds for relief in a single action. *See* 15 M.R.S. § 2128(3). Issues not raised in that single, properly filed petition are deemed waived unless to do so would be unconstitutional or the court determines that the ground could not reasonably have been raised in an earlier action") (footnote, quotation marks, and citations omitted).

postconviction proceeding will not excuse a procedural default.  *Coleman v. Thompson*, 501 U.S. 722, 754–55 (1991).  The *Martinez* court recognized a "narrow exception" where ineffective assistance "at initial-review collateral proceedings" will excuse a procedural default of a claim of ineffective assistance at trial.  *Martinez*, 566 U.S. at 9.  *Martinez*, however, does not assist Petitioner because the Supreme Court expressly declined to apply its holding to "appeals from initial-review collateral proceedings . . .and petitions for discretionary review in a State's appellate courts" because the reason for the exception "does not extend to attorney errors in any proceeding beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance at trial . . . ."  *Id.* at 16.

Petitioner also contends that the procedural default can be overcome because it "will result in a fundamental miscarriage of justice," which is an exception to the procedural default rule.  *Coleman*, 501 U.S. at 750.  The exception is narrow, and in the habeas context, it has only been recognized in cases of "actual innocence," meaning that the petitioner must demonstrate that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt."  *Gunter v. Maloney*, 291 F.3d 74, 83 (1st Cir. 2002) (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).  "Here, however, the petitioner has not attempted to make any such showing, and none is evident on the face of the record."  *Janosky v. St. Amand*, 594 F.3d 39, 46 (1st Cir. 2010).

In the alternative, Petitioner asks the Court to stay the federal proceedings while he returns to state court to exhaust the national-origin-*Batson* claim.  In this case, the stay-and-abeyance procedure, *see Rhines*, 544 U.S. at 275–78, is not warranted.  First, the request is inconsistent with the fact that the claim is procedurally defaulted, which

13

Petitioner concedes, rather than a truly unexhausted claim that would create a "mixed petition." *See supra* n.8. More fundamentally, a stay is supportable because, as explained below, Petitioner has not shown there is a likelihood that the claim would succeed on the merits if it were exhausted and not procedurally defaulted. *See Rhines*, 544 U.S. at 277 (citing the § 2254(b)(2) authorization to deny claims on the merits "notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State").

As is typical before a jury trial, a questionnaire was distributed to members of the jury pool, and the state court questioned Juror 104 about his affirmative answer to a question regarding whether prospective jurors or their family members have been charged with a crime of violence. (Second Jury Selection Tr. at 100–01.) The juror explained that in 1993, while going through a divorce and while he was new to the country, he was charged with violating a protection order, pleaded no contest, and was sentenced to probation. (*Id.* at 101–03.) When asked if he had any concerns at that time about potential immigration consequences, the juror said he did not and he was now a U.S. citizen. (*Id.* at 104.) When the parties exercised their peremptory challenges, the prosecutor removed Juror 104. (*Id.* at 202.)

Neither trial nor appellate counsel asserted a *Batson* challenge. At the state postconviction hearing, when asked whether there was a "noncitizen that was struck from the jury," Petitioner testified that he "believe[d] there was a European or – or a Russian individual that recently just became naturalized" as a citizen. (Postconviction Hearing Transcript at 47.) Trial counsel testified that she did not remember if there was a juror who was European or a Russian who was newly naturalized and did not remember Petitioner

14

ever expressing a preference for the newly naturalized Russian or European to be on the jury. (*Id.* at 176.)

In its order, the state postconviction court rejected the *Batson* claim regarding the Black woman juror because she was not randomly selected, and in a footnote, the postconviction court added:

> [Petitioner] also contended that a recently naturalized immigrant from Russia was stricken from the jury. While *Batson* and its progeny apply to race, ethnicity, and gender, Haji-Hassan has cited no authority - and the court is aware of none - that *Batson* would apply to a recently naturalized citizen who came from Russia. If such a prospective juror was stricken, therefore, this would not have constituted a constitutional violation, and trial counsel would not have been ineffective in not raising a *Batson* issue. In a case involving a Black defendant from Somalia, no prejudice could be presumed from striking a recently naturalized citizen from Russia.

(Postconviction Decision at 13–14, App. 212–13.)

Petitioner argues: (1) the state court's decision was contrary to or an unreasonable application of *Batson* and its progeny because the rule covers national origin as the doctrine is commensurate with the Equal Protection Clause and is thus not limited to race, ethnicity, and gender; (2) the state court's decision was contrary to or an unreasonable application of *Batson* and its progeny because even if a peremptory challenge based on national origin is not covered by *Batson*, Russian is an ethnicity, and (3) AEDPA deference does not apply and de novo review of the *Batson* claim is appropriate because the state court did not conduct a full assessment of the issue under the three-step burden-shifting analysis.

Petitioner's first argument relies on and interprets dicta, rather than an unambiguous holding of the Supreme Court.[9]  Regardless of the merit of Petitioner's argument that *Batson* and its progeny extend or should extend to national origin, given the lack of a Supreme Court case applying *Batson* to national origin, one cannot reasonably conclude that no fair-minded jurist could reach the state court's conclusion.  *See Infante v. McDowell*, No. CV1702596SJOAFM, 2017 WL 11707421, at *7 (C.D. Cal. Dec. 20, 2017) (discussing lack of consensus among circuit courts on whether *Batson* extends to the trait of national origin and concluding that is fatal to a claim that the state court decision was contrary to or unreasonable application of federal law from the Supreme Court).

Petitioner's other arguments fail for similar reasons.  Even if *Batson* covers the national origin or if the category of Russian-American qualifies as an ethnicity, there is no precedent from the Supreme Court that clearly requires a court to conduct and make findings regarding the full three-step burden shifting framework when analyzing an

---

[9] *See J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 128 (1994) (discussing the Supreme Court's "commitment to jury selection procedures that are fair and nondiscriminatory" and the recognition that "potential jurors, as well as litigants, have an equal protection right to jury selection procedures that are free from state-sponsored group stereotypes rooted in, and reflective of, historical prejudice," but only "hold[ing] old that gender, like race, is an unconstitutional proxy for juror competence and impartiality"); *Hernandez v. New York*, 500 U.S. 352, 355 (1991) (concluding at the outset that "peremptory challenges to exclude Latinos from the jury by reason of their ethnicity . . . would violate the Equal Protection Clause as interpreted by our decision in *Batson*").

Petitioner also quoted statements in a pre-*Batson* case, *Hernandez v. State of Tex.*, 347 U.S. 475, 479 (1954), which noted that it constitutes discrimination in violation of the Fourteenth Amendment to try a defendant under a jury system that systematically excludes all members of a national origin, but Petitioner does not argue and the record lacks any evidence to suggest that such a system was employed in this case.

ineffective assistance claim on postconviction review as opposed to a freestanding *Batson* claim in response to a contemporaneous objection during jury selection or at trial.  *See Simon v. DelBalso*, No. CV 19-4263, 2021 WL 3890303, at *14 (E.D. Pa. Mar. 30, 2021) (noting that state and federal courts are divided on the applicability of the three-step burden-shifting framework on postconviction review ineffective assistance claims, which prevents federal courts from finding that state court conclusion was contrary to or an unreasonable application of clearly established law from the Supreme Court).[10]

---

[10] Because the state court questioned whether there was any presumptive prejudice to Petitioner (who is Black and born in Somalia) resulting from the removal of the juror (who was allegedly born in Russia), Petitioner contends the state court must have failed to understand the ability of a defendant to raise a *Batson* challenge even when the identity characteristic (e.g. race, sex, ethnicity) of the defendant and the juror do not align.  A reasonable interpretation of the state court's analysis is not that Petitioner could not challenge the prosecution's removal of a juror without much overlap of the relevant identity characteristics, but rather that the minimal overlap in identity characteristics reduced the plausibility of the inference that the prosecution had a discriminatory motive or that the peremptory challenge worked to Petitioner's detriment at trial.  Because courts are divided about whether presumptive prejudice or *Strickland* prejudice applies to ineffective assistance claims based on the failure to raise a *Batson* challenge, the state court's conclusion was not contrary to or an unreasonable application a Supreme Court case.  *Compare Hutchinson v. Superintendent Greene SCI*, 860 F. App'x 246, 249 (3d Cir. 2021) (prejudice is not presumed for ineffective assistance claim regarding *Batson* issue, and the strength of evidence against the defendant defeated a showing of prejudice from counsel's decision to forego a *Batson* challenge) *and Scott v. Hubert*, 610 F. App'x 433, 434 (5th Cir. 2015) (prejudice not presumed) *with Eagle v. Linahan*, 279 F.3d 926, 943 (11th Cir. 2001) ("If we conclude that the omitted claim would have had a reasonable probability of success, then counsel's performance was necessarily prejudicial").

In addition, while Petitioner is correct that the fact that a defendant has little or no common characteristics with the juror will not categorically prevent a defendant from asserting a *Batson* challenge, the relevant authority does not imply that the extent of overlap between the characteristics of the juror and defendant is always irrelevant to the analysis of the *Batson* challenge, particularly when assessing an ineffective assistance claim based on the decision to assert or forego a *Batson* challenge.  To the contrary, the Supreme Court has acknowledged that the relationship might be more or less relevant depending on the circumstances:

> The emphasis in *Batson* on racial identity between the defendant and the excused prospective juror is not inconsistent with our holding today that race is irrelevant to a defendant's standing to object to the discriminatory use of peremptory challenges.  Racial identity between the defendant and the excused person might in some cases be the explanation for the prosecution's adoption of the forbidden stereotype, and if the alleged race bias takes this form, it may provide one of the easier cases to establish both a prima facie case and a conclusive showing that wrongful discrimination has occurred.  But to say

17

The ultimate question in this context would be whether the postconviction record overcomes the presumption that counsel acted reasonably when making strategic decisions during jury selection, including whether to raise a *Batson* challenge to Juror 104.  The record does not overcome the presumption.  While the omission of an "obviously valid" or clearly meritorious *Batson* claim can constitute ineffective assistance, *see, e.g.*, *Eagle v. Linahan*, 279 F.3d 926, 943 (11th Cir. 2001), even if the state court should have conducted the three-step analysis, and even if this Court were to consider the issue de novo, Petitioner's claim would fail at step one of the *Batson* analysis.  Because Petitioner relies on the mere fact that one of the challenged jurors was born in another country and has presented no other evidence bearing on the motive of the prosecutor, Petitioner has not made a prima facie showing of discrimination.  *See Sullivan v. United States*, 877 F.3d 337, 339–41 (7th Cir. 2017) (attorneys were not ineffective because defendants generally "cannot make out a prima facie case for discrimination by merely pointing out the race of the stricken juror, but that essentially is all he has done here") (citation omitted); *Tolbert v. Gomez*, 190 F.3d 988 (9th Cir. 1999) ("[T]he striking of one juror of a cognizable racial group does not by itself raise an inference of discriminatory purpose.  Instead, the trial court must consider the totality of relevant circumstances").[11]

---

that the race of the defendant may be relevant to discerning bias in some cases does not mean that it will be a factor in others, for race prejudice stems from various causes and may manifest itself in different forms.

*Powers v. Ohio*, 499 U.S. 400, 416 (1991).

[11] Relatively recently, one judge of the First Circuit cautioned lower courts and prosecutors about the difficulty of preventing conscious and unconscious discrimination in jury selection and the challenges that can arise if the prosecutor or trial judge in a relatively more homogenous locale is not fully prepared to scrutinize closely a peremptory challenge of the lone member of a racial minority in the pool of prospective

Petitioner did not assert that he instructed counsel to include any foreign-born jurors, and he did not assert that he ever considered the juror's alleged Russian birth to be important or even relevant. Petitioner cites no cases (and a search did not reveal any) where a single challenge of a U.S. citizen of European birth was sufficient to generate a meritorious *Batson* claim simply because the defendant was also born in a different country.[12] "Thus even with the advantage of hindsight it cannot be said that the omission of the *Batson* claim was so patently unreasonable that no competent attorney would have made it." *Wood v. Ryan*, 268 F. Supp. 3d 297, 301 (D. Mass. 2017) (quotation marks omitted).

In sum, by failing to raise the claim in the discretionary review petition, Petitioner procedurally defaulted his ineffective assistance claim regarding jury selection and cannot overcome the procedural default. Even if the claim is not procedurally defaulted and is instead simply unexhausted, a stay-and-abeyance procedure is not warranted because the state court conclusion was not contrary to or an unreasonable application of clearly established Supreme Court law and because the underlying *Batson* claim lacks merit, which implies that counsel did not perform deficiently, and Petitioner was not prejudiced by counsel's decisions.

---

jurors. *See Hollis v. Magnusson*, 32 F.4th 1, 11 (1st Cir. 2022) (Lipez, J. concurring). Even with the benefit of this assessment, there is no basis to fault the state postconviction court for addressing the nation-origin-*Batson* claim as it did.

[12] The postconviction record does not even establish the country of birth for Juror 104. The questionnaire did not ask for it, the juror's testimony did not reveal it, counsel did not remember it, and Petitioner's recollection was equivocal.

### 2.     Prior Bad Acts of Alternate Suspect

Petitioner claims his attorney provided ineffective assistance by failing to offer evidence regarding the prior bad acts of Majok, who (1) had previously been charged with murder and elevated aggravated assault with the use of a firearm; (2) had four prior misdemeanor convictions for violating bail, assault, refusal to submit to arrest, and criminal trespass; and (3) had been charged with elevated aggravated assault in March 2017. Counsel testified at the postconviction hearing that counsel could not think of a way the evidence would be admissible at trial. (Postconviction Hearing Tr. at 185, 196–97.) The postconviction court concluded that counsel did not provide ineffective assistance because the evidence would have been inadmissible under the state rule and the constitutional right to present a complete defense would not have required a different evidentiary ruling. (Postconviction Decision at 8–11, App. at 207–10.)

Maine Rule 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Like the federal counterpart, the rule "does not exclude the evidence when offered for another purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Me. R. Evid. 404 Adviser's Note to Subdivision (b).

The postconviction court correctly concluded that because any evidence or inquiry about Majok's other bad acts[13] would have been used to show Majok's propensity for

---

[13] Petitioner questions the postconviction court's finding that certain evidence also would have generated hearsay issues and for concluding that some of the incidents resulted in criminal allegations but not

violence or even gun violence, the evidence would have been within the prohibition of the rule. Petitioner did not provide any authority that would question the state court's conclusion that the use of a firearm in one of the other incidents, without more, is not relevant to a non-propensity purpose. Petitioner's argument that the evidence could have been introduced to show the absence of mistake on Majok's part is unpersuasive. The scenario where Majok shot the victim in the head by mistake was simply not a hypothetical that was presented or suggested by the evidence.

The postconviction court also reasonably determined that excluding the evidence under Rule 404(b) would not have impaired Petitioner's federal constitutional right to present a complete defense as recognized in cases like *Holmes v. South Carolina*, 547 U.S. 319 (2006). The relevant Supreme Court cases prohibit evidentiary rules that infringe upon a defendant's "weighty" interests for "arbitrary" or "disproportionate" purposes. *Id.* at 324–26. The Supreme Court, however, has distinguished and approved of "well-established rules of evidence" like those that "permit trial judges to exclude evidence" that is "repetitive, only marginally relevant," or "if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Id.* at 326 (modifications and quotation marks omitted). In other words, rules like 404(b).

---

convictions. The court's statements do not imply that the court believed that the only evidence within the exceptions to the prohibition of Rule 404(b) are criminal convictions. Rather, the state court merely considered the strongest form of evidence and most compelling version of the argument—the types of evidence most likely to approach admissibility because they have the most probative value—and found that even that kind of evidence would fail in the circumstances of this case.

Relevant to this case, the *Holmes* Court examined rules that "regulat[e] the admission of evidence proffered by criminal defendants to show that someone else committed the crime with which they are charged," *id.* at 327, which category would also include so-called "reverse" 404(b) evidence about other bad acts of alternate suspects.  The Court quoted two prominent treatises for evidentiary rules which are "widely accepted" and were not in question:

> Evidence tending to show the commission by another person of the crime charged may be introduced by accused when it is inconsistent with, and raises a reasonable doubt of his own guilt; *but frequently matters offered in evidence for this purpose are so remote and lack such connection with the crime that they are excluded*.

*Id.* (quoting 41 C.J.S., Homicide § 216, pp. 56–58 (1991)) (emphasis added).

> The accused may introduce any legal evidence tending to prove that another person may have committed the crime with which the defendant is charged. *Such evidence may be excluded where it does not sufficiently connect the other person to the crime, as, for example, where the evidence is speculative or remote, or does not tend to prove or disprove a material fact in issue at the defendant's trial*.

*Id.* (quoting 40A Am.Jur.2d, Homicide § 286, pp. 136–138 (1999) (modifications omitted) (emphasis added).

The South Carolina evidentiary rule at issue in *Holmes* prohibited evidence offered for the purpose of attempting to establish third-party guilt if the prosecution had introduced forensic evidence that, if believed, would strongly support a guilty verdict.  *Id.* at 321.  The Supreme Court invalidated the rule because, unlike the widely accepted rules, the state evidentiary rule prohibited evidence not based on "the probative value or the potential adverse effects of admitting the defense evidence of third-party guilt" but rather on "the

strength of the prosecution's case" as a whole based on different evidence. *Id.* at 329. Unlike the South Carolina rule at issue in *Holmes*, Rule 404(b) focuses on the probative value of the evidence in question (the evidence about the prior bad acts) and does not rely on a weight of the evidence assessment. The Maine rule resembles the classic rules approved by the Supreme Court rather than the South Carolina rule the Supreme Court invalidated.

In sum, the state court reasonably concluded that counsel did not perform deficiently by not offering evidence that would have been excluded. The state court decision, therefore, was not contrary to or an unreasonable application of *Holmes* or *Strickland* or their predecessors or progeny.

## C.     Confrontation Clause Claim

Petitioner argues that his federal constitutional right to confront the witnesses against him was violated when he was prohibited from cross-examining Dr. Flomenbaum about evidence that suggested Dr. Flomenbaum's prior removal as Chief Medical Examiner for Massachusetts "was attributed to 'fundamental operational and administrative failures, including a substantial backlog of bodies, one case of a missing body, [his office's] failure to meet public health and occupational safety standards and [Dr. Flomenbaum's] lack of candor with the administration." *State v. Haji-Hassan*, 2018 ME 42, ¶ 8, 182 A.3d 145, 148 (modifications in original).

The Sixth Amendment right to confront witnesses "includes the right to conduct reasonable cross-examination," *Olden v. Kentucky*, 488 U.S. 227, 231 (1988), but trial courts "retain wide latitude . . . to impose reasonable limits on such cross-examination

based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).  A violation occurs when the defendant is "prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby to expose to the jury the facts from which jurors could appropriately draw inferences relating to the reliability of the witness" with the effect that "a reasonable jury might have received a significantly different impression of [the witness's] credibility."  *Id.* at 680.

The Law Court reasoned (and approved of the trial court's reasoning) that the rationales for the Massachusetts removal were of marginal relevance or probative value because (1) they were based on his failures as an administrator and not on his performance as a pathologist, which is reflected by the fact that the Governor of Massachusetts acknowledged in the removal letter that Dr. Flomenbaum's reputation as a pathologist was "excellent" and was not in question, *Haji-Hassan*, 2018 ME 42 ¶¶ 8, 15, n.3; (2) his role as an administrator played no role in Petitioner's case, *id.*, (3) the state never referenced his prior job as a credential or to bolster his credibility and did not use his prior job to qualify him as an expert, *id.* ¶ 15; *see also*, n.6;[14] (4) the argument about bias or potential

---

[14] The Law Court distinguished another case where it reversed the trial court's exclusion of evidence regarding the rationales for the termination.  *See State v. Coleman*, 2018 ME 41, 181 A.3d 689.  Petitioner argues that *Coleman* proves the issue was a proper topic for cross-examination that could not be excluded without violating Petitioner's confrontation right. Petitioner's argument is not persuasive. Although the Law Court concluded that exclusion of the evidence in *Coleman* would not have risen to the level of a Confrontation Clause violation, the Law Court's reasoning in the two cases illustrates that it conducted a sensitive weighing of the relevant factors as instructed in *Van Arsdall* and permitted cross-examination on the issue when the evidence had more than a redundant or "marginal relevance" to the jury's weighing of

motive to produce opinions in favor of the state is no stronger given the prior termination than the argument would be based on the fact of his current employment for the state, which Petitioner was permitted to explore on cross-examination, *id.* ¶ 21; and (5) the characterizations about a "lack of candor" and "failure to communicate fully and frankly" are not specific examples of untruthfulness but are more like extrinsic opinions of a third party that would not conform to the rules for admitting such opinions. *Id.* The Law Court further reasoned that because there was minimal "if any" probative value for the issues of bias or truthfulness, exploration of the issue was substantially outweighed by the likelihood that it would lead to a "fruitless" argument about "what the grounds for removal were or weren't," which would confuse the issues in the case and waste time. *Id.* ¶¶ 16, 22. The Law Court thus determined that the evidentiary ruling was a reasonable limitation on cross-examination and there was no violation of Petitioner's right to confront the witnesses against him.

The state trial court and the Law Court weighed the relevant factors under *Van Arsdall*. Contrary to Petitioner's argument, he was not prevented from exploring a "prototypical form of bias." Although Petitioner was prevented from exploring one line of inquiry regarding the prototypical form of bias, he was permitted to explore the same form of bias—whether the witness had a financial incentive to testify favorably for the state to protect his future employment—by asking questions about the witness's current

---

the witness's credibility. The *Coleman* case does little, if anything, to show that no fair-minded jurists could disagree that decision in this case conflicts with a specific Supreme Court precedent.

employment prospects and financial incentives.  Even if Petitioner were correct that the state court analysis understated the probative value and overstated the alternative means of probing the bias, the facts of this case are not "materially indistinguishable" from a decision of the Supreme Court while reaching a different result, *Early v. Packer*, 537 U.S. 3, 8 (2002), and the analysis is not "so erroneous that 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court]'s precedents.'"  *Nevada v. Jackson*, 569 U.S. 505, 508-09 (2013) (per curiam) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)).

In sum, the state court determination was not contrary to or an unreasonable application of *Van Arsdall* or the other cases Petitioner cites.

### CONCLUSION

Based on the foregoing analysis, an evidentiary hearing is not warranted under Rule 8 of the Rules Governing Section 2254 Cases.  I recommend the Court dismiss Petitioner's petition for habeas relief under 28 U.S.C. § 2254, and that the Court deny a certificate of appealability pursuant to Rule 11 of the Rules Governing Section 2254 Cases because there is no substantial showing of the denial of a constitutional right within the meaning of 28 U.S.C. § 2253(c)(2).

### <u>NOTICE</u>

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof.  A responsive memorandum and shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 17th day of April, 2024.